652 F.2d 348
 Frazier M. GIBSON, Jr., # 59065, Appellee,
v.
Thomas LYNCH, Superintendent Youth Reception and Correction
Center, Yardville, New Jersey; and William H. Fauver,
Commissioner, Department of Corrections, and State of New
Jersey and Gary J. Hilton, Superintendent, Trenton State
Prison, Gary J. Hilton, Superintendent, Trenton State
Prison, Appellants.
 No. 80-1726.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 3, 1981.
Decided June 26, 1981.
 
 John J. Degnan, Atty. Gen. of N. J., Joseph T. Maloney, Deputy Atty. Gen. (argued), Trenton, N. J., for appellants.
 Edward F. Lamb (argued), Robinson, Wayne & Greenberg, Newark, N. J., for appellee.
 Before HUNTER, GARTH and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 Frazier Gibson is a prisoner in the New Jersey prison system. He brought the action from which this appeal is taken under 42 U.S.C. § 1983. Gibson alleged that his confinement under solitary conditions as a result of New Jersey's lack of prison housing, violated his constitutional rights.
 
 
 2
 Prior to a hearing on the merits of Gibson's claims, he was removed from solitary confinement. He then amended his complaint, deleting his claim for injunctive relief and he sought damages both for his confinement in Trenton State Prison under isolated conditions and his prior confinement at the Yardville Classification Facility.
 
 
 3
 Hearings were held by the magistrate to whom Gibson's action was assigned. At their conclusion the magistrate recommended that judgment be entered in favor of Gibson and against defendant Hilton, the Superintendent of Trenton State Prison. No judgment was recommended against the other defendants.
 
 
 4
 The district court in adopting the magistrate's report awarded damages of $800 to Gibson, attorneys' fees of $5,497.50 to Gibson's attorneys and costs in the amount of $303.75. In so ruling, the district court endorsed the magistrate's finding that Gibson had a state created expectation of due process under the fourteenth amendment that had been violated by his solitary confinement at Trenton State Prison and that the defendant Hilton, was not entitled to the defense of immunity.[1] The district court rejected Gibson's claims that his confinement at both Yardville and Trenton violated eighth amendment standards and also rejected his claims of due process violations at Yardville.
 
 
 5
 We agree with the district court that Gibson's confinement did not violate constitutional standards derived from the eighth amendment's prohibition against cruel and unusual punishment. However, we reverse the district court's orders awarding damages, costs, and attorneys' fees to Gibson as we conclude that Gibson's confinement did not violate his fourteenth amendment rights to due process.
 
 I.
 
 6
 Frazier Gibson was convicted in state court for possession of a stolen vehicle and sentenced to a minimum of three and a maximum of five years imprisonment. Gibson was remanded to the Essex County Jail in New Jersey on December 16, 1976 and transferred to the Classification Center at Yardville on January 25, 1977. While at Yardville, Gibson was not given an opportunity to participate in group religious services, to have visitors, to have access to the law library or to have access to vocational or educational opportunities. Gibson, an adult, was housed in an individual cell and segregated from the general population at Yardville, which consists of youthful inmates. His treatment, however, was in accordance with normal procedures for housing inmates who are being classified for assignment to one of the adult prison populations in the New Jersey prison system. (20a)
 
 
 7
 On February 8, 1977, Gibson was classified for Rahway State Prison. Due to a shortage of space at Rahway, Gibson was transferred, instead, to the New Jersey State Prison at Trenton on March 4, 1977, where he was considered a "housing hold" i. e. an inmate being housed at Trenton while awaiting the availability of housing at the institution to which he was assigned. (36a)
 
 
 8
 At Trenton, Gibson was housed in solitary confinement under conditions that would normally be used only to discipline inmates who violated prison rules or were considered especially dangerous or to protect the lives of inmates who were threatened by other prisoners. However, at the time of Gibson's transfer, New Jersey had a serious housing problem in its prisons which were overcrowded. During March, 1977, convicted prisoners were being held in county jails because there was no room in the prisons. Rahway was full and even classrooms were used for bed space at Leesburg State Prison. This condition became especially aggravated at Trenton after a strike-type disruption at the Leesburg State Prison resulted in 70 inmates being transferred to Trenton.[2] In order to prevent the spread of this disturbance, the Leesburg inmates were segregated from both the general population at Trenton and the "housing holds", such as Gibson, who arrived at Trenton the day following the arrival of the Leesburg prisoners.
 
 
 9
 Gibson's confinement at Trenton from March 4, 1977 until June 1, 1977 was in Seven Wing which contained maximum security isolation cells.[3] The cells contained a steel bed, a toilet, and a sink with cold water. During this period, Gibson was permitted to shower for ten minutes each day and he was allowed window visits. He was also permitted a recreation period six times during this period. Meals were served in the cell from a cart and Gibson had neither radio nor television in his cell. Gibson was not issued clothing, although he received clean sheets and towels on a weekly basis. From May 5 on, Gibson was provided with clothing, personal clothing laundry service, a bucket for hot water, soap and personal items. As a result of his isolated confinement, Gibson was denied entry into the general prison population, and was not permitted regular yard recreation, contact visits, personal access to the law or recreational library,[4] community religious services, work or vocational training.
 
 
 10
 For reasons which do not appear in the record, Gibson was transferred to the general population of Trenton State Prison on June 1, 1977 and finally to Rahway on June 10, 1977. Gibson, therefore, claims damages for the period from March to June, 1977 when he was confined in Seven Up.
 
 II.
 
 11
 We agree with the district court[5] that Gibson's confinement at Yardville and his subsequent confinement at Trenton did not violate Gibson's eighth amendment right to be free from cruel and unusual punishment.
 
 
 12
 Gibson had arrived at Yardville on January 25, 1977. He was housed at Yardville in the prison reception or intake unit which is an autonomous unit distinct from the general population of the Youth Corrections Center. Gibson had two interviews[6] and on February 8, was classified for Rahway. However, due to the lack of prison housing facilities which we have previously described, Gibson was transferred to the Trenton State Prison from Yardville on March 4, 1977 and confined as a "holdover" until he could be transferred to general population housing. Addressing Gibson's claims as they pertain to his stay at the Youth Reception and Correction Center at Yardville, New Jersey, the district court stated:
 
 
 13
 The evidence relating to plaintiff's stay at Yardville shows no violation of any constitutional right of the plaintiff. Housing at the classification center is in individual cells and plaintiff was segregated from the youthful inmates who were serving sentences at the institution. During the classification period plaintiff was not given an opportunity to participate in corporate worship services, there was no access to the law library and plaintiff did not enjoy the rehabilitative and educational facilities afforded to other inmates in the New Jersey prison system who had already been classified and were housed in permanent quarters. However, it is clear that residence at the classification center is intended to be, and actually was for this plaintiff, merely temporary. There is no showing that the conditions of his confinement were in any way cruel or unusual. If plaintiff was denied any rights, it was clearly "justified by the considerations underlying our penal system". Price v. Johnston, 334 U.S. 226, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). The need to classify prisoners coming into the system and segregate them until the completion of the classification process is too evident for argument. This is an area where the court should not "intervene in matters of state prison administration, recognizing that a wide latitude for judgment and discretion must be extended to prison officials." Gittlemacher v. Prasse, 428 F.2d 1, 4 (3rd Cir. 1970).
 
 
 14
 (20a)
 
 
 15
 Although "the (eighth) amendment proscribes more than physically barbarous punishments (and) ... embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency,' " Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (citations omitted), no court has held that confinement, such as that experienced by Gibson at Yardville, is prohibited by the eighth amendment.
 
 
 16
 Our review of the record and the district court's findings reveals no denial of Gibson's rights and indeed the record discloses that in all respects Gibson's treatment was governed by the same rules and regulations as the other inmates being classified at Yardville. Thus, we agree with the district court that none of the conditions of which Gibson complains at Yardville, constituted eighth amendment violations.
 
 
 17
 We also agree with the district court that Gibson's confinement at Trenton State Prison did not violate his eighth amendment rights, even though the conditions at Trenton were considerably more harsh than those which Gibson encountered at Yardville. Although Gibson's complaints included, among others, complaints about his food, unnecessary isolation, the physical conditions of his cell, the lack of clothing and laundry service, and the limitations on recreation and shower time, the district court found that none of these conditions, either singly or in combination, approached constitutional inadequacy. In so concluding, the district court found that Gibson's nutritional needs were met, that he was afforded living and hygenic conditions which, although spartan, were not injurious to a person in reasonably good physical and mental health. All his medical requirements were met and neither the type of his confinement nor the consequent deprivations of which he complains were of constitutional dimension. (21a) These findings are not clearly erroneous nor did the district court err in its conclusions, for we too agree that on this record these deprivations did not amount to violations of the eighth amendment.
 
 
 18
 First, as a prisoner who has been convicted and sentenced, Gibson cannot claim the right to be free from punishment. See Bell v. Wolfish, 441 U.S. 520, 531-35, 99 S.Ct. 1861, 1869, 1872, 60 L.Ed.2d 447 (1979) (unlike convicted prisoners, pre-trial detainees may not be "punished"). He may only claim the right to be free from excessive punishment "so totally without penological justification that it results in the gratuitous infliction of suffering." Gregg v. Georgia, 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976).
 
 
 19
 Second, the conditions of Gibson's confinement, as we have observed, met his basic needs for nutrition and shelter and did not "involve ... unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (citation omitted). Moreover, the Supreme Court in affirming a court of appeals decision that upheld a 30-day limit on confinement in punitive isolation for Arkansas prisoners, explicitly rejected the notion that "indeterminate sentences to punitive isolation always constitute cruel and unusual punishment." Hutto v. Finney, 437 U.S. 678, 685, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978). Aware of this instruction, we must be careful to consider isolation sentences with reference to other factors.
 
 
 20
 In Hutto the length of isolated confinement was only one of many factors which led to the Court's decision that the conditions under which Arkansas' prisoners were incarcerated in isolated confinement, violated the eighth amendment. Commenting on the trial court's analysis, the Hutto Court observed that "(t)he court took note of the inmates's diet, the continued overcrowding, the rampant violence, the vandalized cells, and the 'lack of professionalism and good judgment on the part of maximum security personnel.' The length of time each inmate spent in isolation was simply one consideration among many." Hutto at 686, 98 S.Ct. at 2571 (citation omitted).
 
 
 21
 In considering Gibson's isolated confinement, the district court correctly found that given the adequate attention to Gibson's nutritional and other needs, his confinement for more than 30 days in isolation cannot be considered to trench upon his eighth amendment rights. As the district court noted, Gibson's isolation fit within the circumstances contemplated by Hutto :
 
 
 22
 It is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual. If new conditions of confinement are not materially different from those affecting other prisoners, a transfer for the duration (to isolation) of a prisoner's sentence might be completely unobjectionable and well within the authority of the prison administrator.
 
 
 23
 Id. at 686, 98 S.Ct. at 2571 (citation omitted).
 
 
 24
 We are satisfied, as was the district court, that Gibson's eighth amendment rights were not violated under the circumstances of his confinement in Trenton.
 
 III.
 A.
 
 25
 Our determination that Gibson's confinement did not violate the eighth amendment's proscription of cruel and unusual punishment does not end our inquiry into whether Gibson's treatment violated any other federally protected constitutional right. As Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) made clear, "though his (a prisoner's) rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." Id. at 555, 94 S.Ct. at 2974.
 
 
 26
 Liberty interests may be created by state law as well as by federal law. As the Court in Wolff noted, "(w)e think a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State." Id. at 558, 94 S.Ct. at 2976. Here, Gibson relies on state law "policies and practices" as furnishing the necessary state expectation giving rise to a liberty interest which Gibson claims has been violated.
 
 
 27
 The district court found that New Jersey had created a liberty interest which was entitled to the protection of the fourteenth amendment and that this interest was violated when Gibson was confined in isolation for three months. Having found that Gibson was not placed in segregated confinement as a disciplinary measure, but rather for the administrative convenience of the prison authorities who were faced with a severe housing shortage (23a), the district court conceived that its task required an inquiry into "whether there are established policies which have created for the plaintiff some liberty interest requiring due process protection." (25a). After reviewing the policies of the New Jersey Department of Corrections which are reflected in the New Jersey Administrative Code, Administrative Plan Manual, and in the Trenton State Prison Inmate Handbook, the district court concluded that "While none of the enumerated privileges (clothing, recreation, movies, etc.) individually rises to the substance of a constitutionally protected right, all of them taken together appear to present a way of life which is guaranteed to New Jersey prisoners." (emphasis supplied) (26a). The nub of the district court's conclusions is expressed in its summary:
 
 
 28
 It is concluded that the expressed policies of the Department of Correction created a justifiable expectation that plaintiff would not be confined in isolation for three months in the conditions found to have existed. It is concluded that plaintiff's interest in the way of life which is afforded to inmates who are not subject to disciplinary restrictions "has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated". Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935. It is concluded that plaintiff was not afforded any required procedures at Trenton State Prison.[7]
 
 
 29
 (27a)
 
 
 30
 In response to Gibson's claims, and the district court's holding, New Jersey argues that: (1) Gibson had no state-created "liberty interest" which would have entitled him to a general population cell after his first 30 days in prison; (2) that no such "liberty interest" entitling Gibson to a particular "way of life" was ever created by New Jersey law; and (3) that any reliance on disciplinary regulations, as creating a liberty interest, was misplaced.
 
 
 31
 We turn to these contentions.
 
 B.
 
 32
 At first blush Gibson's argument has surface appeal. It is undisputed that for a period of almost three months, Gibson, who had committed no infraction, who was not a disciplinary or risk prisoner, and who needed no protection for his own well-being, was incarcerated in a type of confinement normally associated with prisoners who are under disciplinary sanction or who require protection. However, despite the acknowledged severity of Gibson's confinement, we cannot lose sight of the uncontroverted fact that the reason for Gibson's placement in a Seven Up cell was his quarantine status as a newly admitted prisoner at a time when New Jersey's prison system was experiencing a grave shortage of general population cell space.
 
 
 33
 Because Gibson's segregated confinement resulted from a lack of prison housing, our inquiry cannot be resolved by reference to those cases which concern prison discipline, (Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)) or cases which concern prisoner isolation in special risk units (Hodges v. Klein, 421 F.Supp. 1224 (D.N.J.1976), affirmed 562 F.2d 276 (3d Cir. 1977)), or instances where prisoner isolation is ordered for reasons of protective custody. Such situations have no bearing upon the unique circumstances present here which came about from a housing crisis, which we are told never occurred prior to, or since, that time. (Hilton Reply Br. p. 11.) We have not been directed to any authority dealing with this type of emergency circumstance and our independent research has disclosed none. Thus, we must look to the general principles and teaching found in related Supreme Court cases in order to analyze the claims made by Gibson.
 
 
 34
 As we have observed, Wolff v. McDonnell, supra, is a disciplinary case. Thus its factual configuration and its conclusions are inapposite to our present situation. Nevertheless, Wolff does afford us some guidance in approaching the problem presented here. We have previously noted that Wolff recognizes that state law, if it so provides, may afford a prisoner a liberty interest subject to vindication under the fourteenth amendment. However, in its subsequent decisions, e. g. Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), the Supreme Court rejected claims of prisoners who sought the protection of the fourteenth amendment to prevent their transfers from one prison to another.
 
 
 35
 The Court explained that unless the state has created a prisoner's right to remain in the prison to which he was initially assigned, no federal right exists to prevent his transfer to another prison, even though such a transfer may lead to confinement in a more severe institutional setting. The Supreme Court specifically rejected the notion that "any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." 427 U.S. at 224, 96 S.Ct. at 2538. It also rejected the suggestion that "any change in the conditions of confinement having a substantial adverse impact on the prisoner ... is sufficient to invoke the protections of the ... Clause." Id. To hold otherwise, the Supreme Court said, "would subject to judicial review, a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." Id. at 225, 96 S.Ct. at 2538. The importance given to this admonition by the Court is revealed by its closing observation that "the federal courts do not sit to supervise State prisons...." Id. at 229, 96 S.Ct. at 2540.
 
 
 36
 Thus, in reviewing this appeal, we must determine whether New Jersey's statutes, regulations or rules have provided Gibson with a liberty interest stemming from a justifiable expectation that his quarantine confinement would terminate at the conclusion of 30 days. If no such expectation has been created by New Jersey, then despite the harsh experiences which Gibson has undergone in his restricted confinement, Gibson may not obtain relief in this action.
 
 C.
 
 37
 Because the liberty interest to which we have referred is a prerequisite to any fourteenth amendment protection which may be afforded to Gibson, our inquiry here must start with a consideration of New Jersey's legislative and administrative enactments.
 
 
 38
 Our examination of New Jersey's laws immediately reveals that New Jersey has invested the Commissioner of the Department of Corrections with broad and discretionary power over those persons who are committed to the State's institutions. N.J.S.A. 30:1B. The Commissioner has been granted the power to administer the work of the Department of Corrections and the power to issue rules and regulations in connection therewith. He has been empowered as well as to "determine all matters relating to the unified and continuous development of the institutions ... within his jurisdiction" and to determine all matters of policy. N.J.S.A. 30:1B-6(a), (e), (f), (g). In addition, under statute, the power to transfer inmates from one institution to another and the power to designate places of confinement are entrusted to him. N.J.S.A. 30:4-85, 30:4-91.1.[8]
 
 
 39
 No statute limits the length of time that an inmate may be confined in a particular environment. That determination, under the statutes to which we have referred, is peculiarly within the Commissioner's broad discretion and is ordinarily exercised by the promulgation of rules and regulations which the Commissioner issues under the powers granted by statute. Indeed, limitations on the use of isolated confinement have been the subject of regulation, but these regulations, as we point out below, concern only the subjects of disciplinary detention, protective custody detention, and administrative segregation and do not limit the use of segregated housing for housing holds. Thus, it appears under New Jersey's relevant statutes, Gibson could have no justifiable expectation that at the end of 30 days in prison, he could look to an automatic transfer from his quarantined status or cell to a general population status or cell. Nor does Gibson direct us to any regulations or administrative rule which would give rise to such an expectation. To the contrary, the only regulations which relate to the segregation of prisoners and to the procedures governing such segregation, are those which are concerned with disciplinary detention, N.J.A.C. 10:35-6.1 6.16, and administrative segregation where a prisoner is in need of protective custody or has displayed serious problems of maladjustment. N.J.A.C. 10:35-6.1 6.16; 10:35-69.1 70.6. These regulations, as we have pointed out, however, have no bearing upon the issue here, because Gibson was not a disciplinary problem, was not in need of protective custody and was not uncontrollable or suffering from any serious maladjustment requiring administrative segregation.
 
 
 40
 On the other hand, rules published by the Superintendent of Trenton State Prison[9] that do relate to "housing holds" such as Gibson, support the State's position that administrative quarantine was properly used to house inmates who were "in between" housing assignments and awaiting space availability. The Addendum to the Trenton State Prison Inmate Handbook dated February 18, 1977, expressly provides that "administrative quarantine at State Prison, Trenton is to be used for the housing of ... Prison Reception Unit housing holds assigned by the Inter-Institution Classification Committee[10] for assignment to State Prison, Rahway or State Prison, Leesburg." (33a)[11] Gibson's status as a housing hold for whom no space was available at Rahway where he had been assigned, clearly falls within this provision.
 
 
 41
 We understand and share the dissent's dismay that Mr. Gibson was not housed in a general population cell. However, the record is clear that no housing space existed to accommodate Gibson at the Rahway institution for which he was classified. Moreover, the record is uncontroverted that this housing shortage was extraordinary. Indeed, it was the first and only time that such a condition had occurred. The record is also uncontroverted that shortage of housing facilities was genuine and that under relevant legislation, the Commissioner had been granted complete discretion to cope with such a circumstance. In so doing, we note that the Commissioner meticulously observed all mandated regulations and procedures for administrative quarantine. See note 13, infra. Thus, the dissent's citations of privileges afforded to general population prisoners, quoting from the magistrate's opinion, see dissenting opinion note 4, are not relevant insofar as Gibson is concerned, because Gibson, who was in administrative quarantine, and not in the general population, received all the rights to which a person in administrative quarantine is entitled. Thus, it is not surprising that no evidentiary record references support the dissent's assertion that "(t)he prison officials violated virtually all of (Gibson's) rights included in the Handbook" (dissenting op. typescript at 9). Nor is there evidentiary record support for the dissent's statement that "the reasons asserted by the prison officials for their treatment of Gibson are not completely bona fide" (dissenting op. typescript at 11). Indeed, Gibson himself does not make that contention, recognizing that his status in administrative quarantine was due solely to the lack of housing accommodations. Having examined the New Jersey statutes, regulations and administrative rules which bear on the subject of housing, we are obliged to concur in the conclusion urged upon us by the State:
 
 
 42
 (U)nder New Jersey law, while the authority of prison officials to place inmates in segregation for disciplinary reasons, or to classify them for the close custody Management Control Unit, is limited and qualified by the Department's own standards in such manner as to give the inmates a substantive right which is entitled to due process protections, the officials' authority to house a new inmate in administrative quarantine for several months is not so qualified or limited.
 
 
 43
 (Hilton br. at 29)
 
 
 44
 In the absence of such qualification or limitation, no substantive right such as claimed by Gibson may be found. It is evident to us that New Jersey has provided no entitlement or expectation from which Gibson may derive a liberty interest. It is undoubtedly for this reason that the thrust of Gibson's argument and the rationale of the district court's decision, focused not on the statutes, regulations or rules affording such an interest but rather on the purported "policy and practices in force and effect at Trenton State Prison." (Gibson br. p. 23)Gibson has argued that the testimony of various witnesses as well as certain Standards of the Division of Correction and Parole established a "policy and practice" at Trenton State Prison. That policy, according to Gibson, was to the effect that, after a short period of orientation, prisoners were afforded all of the privileges of the general population, that only risk inmates had privileges restricted and that in all cases of restrictions, hearings were afforded. Thus, he contends that taking the sum total of these "policies and practices" into account, a reasonable expectation arises that an inmate would not be placed in the type of confinement in which Gibson was placed for an indefinite period of time which denied these privileges. (Gibson br. p. 24)
 
 
 45
 The district court was persuaded by this argument and enumerated the various deprivations that Gibson had experienced and the privileges which were denied to him because of his confinement in administrative quarantine. As we have previously related, the district court held: "While none of the enumerated privileges individually rises to the substance of a constitutionally protected right, all of them taken together appear to present a way of life which is guaranteed to New Jersey prisoners." (26a). Accordingly, we turn next to an analysis of the "policy and practice" premise which underlies the district court's liberty interest determination.
 
 D.
 
 46
 For two reasons, we are compelled to reject the district court's analysis and conclusion. First, as we understand the Supreme Court's teaching, in Meachum v. Fano, supra, and Montanye v. Haymes, supra, deprivations and loss of privileges, even in combination cannot create a state expectation or liberty interest. Indeed, the Supreme Court reversed the First Circuit's decision in Meachum which had held that an inmate's interest in privileges was encompassed within the liberty protected by the fourteenth amendment. The First Circuit, in so holding, had stated: "At issue is not a simple loss of privileges ... but a significant modification of the overall conditions of confinement." 520 F.2d at 374.
 
 
 47
 As noted earlier, in disapproving this analysis as the basis for a liberty interest, the Supreme Court rejected at the outset the notion that any grievous loss or any change in the conditions of confinement would be sufficient to invoke the protections of the due process clause. Thus, without more, Meachum's authority requires us to reject the district court's conclusions.
 
 
 48
 Second, even if we had doubt, which we do not, about the reach of Meachum, and thus our legal analysis, that doubt would be dispelled in this case because no policy or practice such as Gibson asserts was ever established. New Jersey, in its reply brief, accurately depicts the record with respect to the absence of such a policy or practice:
 
 
 49
 First of all, plaintiff was not the only newly admitted inmate being kept in quarantine beyond 30 days. There were other inmates in the same position as plaintiff during the time of the critical cell shortage, i. e., general population "holdovers" in quarantine. Those inmates were not given (and there was no evidence that they were given) "hearings". (2T17-18 to 20; 1T136-13 to 1T137-24; 1T167-15 to 1T168-8). Thus, if there existed any "policy or practice" concerning the retention of new inmates in administrative quarantine during a cell shortage, it was not one to the effect that the inmates would be transferred to general population in 30 days or be given "hearings", but to the contrary. Secondly, the "policy and practice" theory is enervated by the fact that there had never previously existed a cell shortage of such magnitude in the prison system which could have fostered the beginning of any history of "policies and practices" as alleged.
 
 
 50
 (Hilton Reply Br. p. 5-6.)
 
 
 51
 Thus, the answer to Gibson's contention that the "policy and practice" of New Jersey created a liberty interest whereby quarantined inmates were to be transferred to the general population after 30 days, is twofold: the legal authority that exists is to the contrary; and even were it otherwise, no such policy or practice for which Gibson contends has ever been in effect.
 
 E.
 
 52
 Finally, we consider the argument which Gibson makes, and which the district court adopted, that New Jersey's disciplinary regulations are the source of Gibson's liberty interest in this case. As we understand the argument, it, too, has a superficial appeal. Gibson contends that because a prisoner who has been segregated for disciplinary reasons must be afforded a hearing and periodic review of his confinement in isolation, a fortiori, a prisoner such as Gibson who had committed no infraction, should, at the least, be entitled to the same procedures.
 
 
 53
 This argument, however, fails for two reasons. First, as we have previously discussed, the only standards and regulations of New Jersey which limit the authority and discretion of prison officials are found in the context of disciplinary cases, protective custody cases, and severe risk cases. Thus prisoners subject to segregation for such reasons may claim a substantive right not to be so confined without due process protections. But, in each of these circumstances, in order to segregate such a prisoner, the prisoner must have been found to come within the provisions of the particular standard. To determine whether the prisoner has breached prison rules, or is a threat, or requires protection, evidence sufficient to impose segregation must be produced at a hearing in accordance with procedural safeguards. Here, however, Gibson's sole reason for having been segregated in Seven Up is that there was no other cell or other facility in which he could be detained until such time as the circumstances giving rise to New Jersey's institutional housing strain, eased.
 
 
 54
 He could not be assigned to a general population area at Trenton because he was not the type of prisoner who would be properly classified for inclusion in the prison's general population. It is for this reason that Gibson had initially been classified for Rahway. The prisoners at Trenton State Prison include those with sentences in excess of 20 years, or prisoners who have had substantial and notorious prior records, or those in need of protective custody. As the record reveals, generally only those inmates with the most complicated and severe sentences or violence-prone prisoners are assigned to Trenton, which is the highest security institution in the State.
 
 
 55
 Compounding the housing situation was the transfer to Trenton of some 70 inmates from Leesburg, who had been responsible for a disturbance in that institution. The arrival of these inmates created still another strain on the prison administration, not only because of the added population which they represented, but also because one of their number died of a respiratory disorder within some 36 hours after his arrival at Trenton. The Trenton authorities were fearful that security might be affected because rumors had circulated that this inmate had not died of natural causes, but had rather been beaten to death.
 
 
 56
 It was against this background that Gibson and the other Yardville transferees were housed temporarily with the protective custody inmates in Trenton's Seven Wing. This section of the prison, which because of its unique structure, resulted in the imposition of restrictions on the movements of its inmates. These restrictions were ordered because of security problems designed to keep more dangerous prisoners separate from those such as Gibson, who were mere "housing holds." The prison authorities recognized this situation by listing Seven Up prisoners such as Gibson on a seniority list so that they could be removed to a general population cell on a "first-in, first-out" basis, when such cells became available. During their stay, however, because of security concerns respecting movement of various classes of prisoners from their cells in Seven Up, the prison was unable to provide housing hold inmates with the same amenities which were provided to inmates in general population areas.
 
 
 57
 The record discloses that transfers of housing holds from Seven Up cells had to await the availability of space in the Rahway and Leesburg Prisons. Superintendent Hilton testified that:
 
 
 58
 ... our concern with Mr. Gibson and those who came with him was to keep them warm, feed them, and basically keep them out of an incident ... When he moved to Seven Up, we certainly were aware that the situation was not a good one, ... but our problem was then was one of logistics.... We, in fact, did not know how soon (Gibson and the other housing holds) were going to be able to go to Leesburg or Rahway. It was almost a week-by-week kind of development.... If the parole board gave dates, that meant that more men could reasonably be classified to minimum. So we really didn't know how soon they could move. The other fact was we had the MCU (Management Control Unit) unit in the Seven Right area and we were very concerned of moving these holdovers, these persons that were essentially inappropriate for Trenton, moving them through the management control unit into population where we weren't sure they could handle whatever pressure might be brought upon them ... our concerns were very real.
 
 
 59
 (2T 17-18).
 
 
 60
 Apparently toward the end of May 1977, the cells in the upper tiers of Seven Up that had been vacated and dismantled so that a weapon search could be conducted, were returned to usable condition. It was at that time that the Management Control Unit high-risk inmates transferred to these cells and the holdover inmates, including Gibson, were placed in a more normal environment where general population privileges could once again be furnished.[12]
 
 
 61
 As we have discovered, New Jersey has no statutes or rules which limit its officials in ordering segregated "housing holds." While it appears logical to assert that an inmate such as Gibson, who has caused the prison administrators difficulty only because of his arrival at a time of a prison housing shortage, should not be denied the due process safeguards to which offending or high-risk inmates are entitled nevertheless, we cannot create a state expectation where none exists. Nor can we create such an expectation from the fact that other regulations pertaining to other situations have been promulgated to satisfy concerns that do not exist in Gibson's case. As we noted earlier, the only mention of administrative quarantine appears in the Trenton State Prison Inmate Handbook Addendum and that provision which describes the nature of such quarantine provides explicitly for the type of confinement in which Gibson was held.[13] Those provisions, harsh though they may be, establish the limits of Gibson's justifiable expectations.
 
 
 62
 The second answer to Gibson's argument that the disciplinary rules form the basis of a liberty interest may be found in the state's response to Gibson's contention that since hearings are provided for other forms of segregation, a hearing must be provided to him. New Jersey replies to this assertion by pointing to the lack of any purpose which such a hearing could serve, even had one been afforded to Gibson. As the State points out, disciplinary hearings are held to determine if the prisoner breached a prison rule, but in Gibson's case there
 
 
 63
 ... was nothing to hold a hearing about. What plaintiff is really complaining about is the fact that he was kept in quarantine, not that he was not given a hearing. He would be just as dissatisfied about being kept in quarantine if he did have a hearing. And even if there were a "hearing" what would it consist of beyond a statement to plaintiff that he was being kept in quarantine because there was no cell space in general population? That explanation, plaintiff admitted, was given to him by prison personnel.
 
 
 64
 (Hilton Reply Br. at 10.)
 
 
 65
 New Jersey, by its legislature, has seen fit to grant the Commissioner of the Department of Corrections, rather than this court, the power to administer and run the state prison system. Hilton testified that due to the severe housing crisis in the New Jersey prisons, compounded by the strike at Leesburg, he was forced to apply to Gibson, and the other "housing holds", the provisions and standards of administrative quarantine rather than those generally applicable to newly classified prisoners for whom housing was available. These procedures were adopted in accordance with regulations formulated to deal with housing crises and they were followed insofar as Gibson was concerned. Thus, as we have previously observed, the record does not support the dissent's assertion that "(t)he prison officials violated virtually all of the rights included in the Handbook" (dissenting op. typescript at 9). Nor does Winsett v. McGinnes, 617 F.2d 996 (3d Cir. 1980) support the dissent's argument. Winsett held no more than that when a state's regulations provide three bases for refusing work release, the authorities may not, without appropriate legislation, arbitrarily deny work release on still another ground. Under New Jersey Statutes and Regulations, the Commissioner is given all encompassing authority to promulgate rules of prison conduct and administration. The rules which were included in the Handbook were established in accordance with this authority. So, too, were the rules constituting administrative quarantine which modified the Handbook regulations. Those rules were also the product of the Commissioner's discretionary authority. We therefore fail to understand the dissent's argument (dissenting op. typescript at 9) that the Commissioner, who has full authority to enact, modify or amend the relevant regulations did not have the authority to provide for the housing of inmates, such as Gibson, when he established by appropriate regulation, a category of "housing holds" in order to cope with a housing crisis such as the one which occurred in early 1977.
 
 IV.
 
 66
 An independent issue addressed by both parties is whether the defendants were entitled to good faith immunity in the event that a liberty interest was found and infringed. The district court found that the defendant prison officials were not entitled to a "qualified good faith immunity defense" under the rule established in Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) which provides that such immunity is denied only "if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known that their conduct violated the constitutional norm." Id. at 562, 98 S.Ct. at 860. New Jersey strenuously urges that its officials were immune under this standard. Inasmuch as we have determined that Gibson had no liberty interest, there is no necessity to reach the question of the remaining defendant official's good faith immunity.V.
 
 
 67
 We conclude that we cannot enforce a prisoner's interest in something as nebulous as "a way of life which is guaranteed to New Jersey prisoners" (26a) in the face of explicit statutory and administrative enactments to the contrary. An inmate cannot be said to have a protectible liberty interest, when, as here, there is an explicit, valid, expression of the state which compels the opposite conclusion.
 
 
 68
 Our discussion demonstrates that New Jersey's placement of certain inmates in Administrative Quarantine in March, 1977, as a temporary solution to an emergency prison housing shortage, did not violate any federal constitutional standards. While we can sympathize with those who were affected by this circumstance, we cannot fault the prison administrators, who, under appropriate state authority, took the actions which they regarded as necessary to house an additional influx of prisoners in an already overburdened and overcrowded prison system. The fact that some deprivations occurred and that some privileges were lost, and the fact that due process safeguards were afforded inmates segregated for disciplinary reasons, may appear anomalous, but these circumstances are of no constitutional relevance to our decision here.
 
 
 69
 The orders of the district court which were filed January 29, 1980 and April 17, 1980 will be reversed and the district court will be directed to enter judgment for the remaining defendant, Hilton, Superintendent of the Trenton State Prison. Each party will bear its own costs.
 
 
 70
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting in part and concurring in part.
 
 
 71
 This appeal has been taken from a final judgment of the district court awarding Frazier M. Gibson, Jr., $800 in damages and his attorney $5,497.50 in fees plus $303.75 in costs against Gary J. Hilton, Superintendent of Trenton State Prison. Frazier Gibson brought his pro se suit under 42 U.S.C. § 1983 and challenged the constitutionality of the conditions of his confinement while an inmate at the Yardville Youth Reception and Correction Center and at Trenton State Prison. In holding for Gibson, the district court adopted the Magistrate's Report and Recommendation as amended, after conducting an independent review of its findings of fact and conclusions of law. The principal issue in this case is whether the New Jersey Department of Corrections, through either its regulations or its policies and practices, created a fourteenth amendment liberty interest in a minimum standard of conditions of confinement which was then violated without due process of law.
 
 
 72
 The majority holds today that, in spite of the deplorable conditions in which Gibson was held, the district court must be reversed because New Jersey has created no constitutionally cognizable liberty interests for inmates classified among the general prison population. I dissent from that portion of the majority's decision which holds that Gibson had no fourteenth amendment interests in the conditions of his confinement. Further, because I believe that Gibson was deprived of his state-created liberty interests without due process of law, I would reach the secondary issue of Hilton's good faith immunity. I have concluded that the district court erred by not extending immunity to Hilton. I therefore concur in the result reached by the majority.
 
 I.
 
 73
 On May 26, 1977, while an inmate at Trenton State Prison, Gibson filed a pro se complaint under 42 U.S.C. § 1983 against Gary J. Hilton. His articulately pleaded complaint sought injunctive relief and alleged that at Trenton State he was being held in solitary confinement twenty-three hours and fifty minutes each day. He further alleged that his cell was 5 foot by 7 foot square, contained no hot water and was permeated by "a constant smell of human waste from the old out-dated toilet." He complained that he received only 1 hour per week of recreation which was taken in "a small alley" and that his clothes had gone unlaundered for sixty days at the time of the complaint. As to the confinement at Yardville which preceded his stay at Trenton State, he alleged that he was denied visitation rights with his family and friends, an opportunity to earn good time credit towards parole, access to legal and educational materials, and movement within the facility.
 
 
 74
 The defendants moved to dismiss the complaint as moot in February, 1977. They asserted that Gibson had been released from solitary confinement in June 1977 and subsequently transferred to Rahway State Prison. On August 14, 1978, the district court ordered an attorney to be appointed on Gibson's behalf. Gibson's attorney amended the complaint to include a claim for damages and added Thomas Lynch, Superintendent of Yardville, and William H. Fauver, Commissioner of the Department of Corrections, as defendants. The case was assigned to a magistrate and a two-day hearing was held on March 5 and March 6, 1979.
 
 
 75
 The Magistrate found that Gibson had been classified for Rahway on February 8, 1977, after receiving a 3- to 5-year sentence in state court for possession of a stolen vehicle. He remained in the classification unit at Yardville until March 4, 1977, when he was transferred to Trenton State Prison. After describing Gibson's stay at Yardville, the Magistrate described the conditions of confinement at Trenton State as follows:
 
 
 76
 On March 4, 1977 Gibson was taken to Trenton State Prison where he was lodged in Seven Left Wing for four days. Seven Left is a maximum security area. While there he was confined to a 5 X 7 X 8 cell containing a steel bed, a toilet and a sink with running cold water. Meals were served on a tray in the cell, food being served from a rolling cart. Plaintiff had no personal effects and had arrived from Yardville with only the clothes he was wearing. He was provided an opportunity to shower during a ten minute period on the third evening but did not shower for lack of a towel and soap.
 
 
 77
 Thereafter, plaintiff was transferred to a cell of similar dimensions and facilities in Seven Up where he remained until June 1, 1977, confined by steel walls and a front gate. Inmates in Seven Up were given a ten minute opportunity to shower daily and were permitted window visits. Except for these interruptions and six occasions when he was permitted a recreation period outside his cell in a narrow yard, Gibson was held in his cell. Meals continued to be served in the cell from the following food service cart. The food was the same as that served to the general prison population, albeit somewhat cold. Plaintiff had no radio or TV in his cell, either by express prohibition as he testified, or by the prison officials' discouragement of these amenities in plaintiff's quarters as testified by Superintendent Hilton. Gibson remained in the clothing in which he had arrived until May 5 when he was given clothing, a bucket for obtaining hot water, soap and personal items. Prior to that, any laundry was done in the sink in the cell. Clean sheets and towels were provided weekly, as was personal laundry service after May 5.
 
 
 78
 The plaintiff's cell was permeated by an odor which apparently emanated from leaking plumbing. The odor and the emotional strain of not knowing when he would be released from his segregated confinement contributed to stomach discomfort for which he was given patent antiacid remedies. During his segregation he was not permitted to participate in activities with the general prison population, no movies, no contact visits, no regular yard recreation, no personal access to the law library except through the offices of the paralegal group, no community worship services, no access to the recreational library, no work or vocational training.
 
 
 79
 On June 1, 1977 plaintiff was placed in the general population at Trenton State Prison and was permitted to participate in all privileges including taking meals in the mess hall, having recreation opportunities in the big yard and personal access to the law library.
 
 
 80
 Seven Wing, in which plaintiff was housed, is a ten story building reserved for the most troublesome prisoners who require maximum security in the State's maximum security prison. The lower floors are allotted to prisoners in protective custody and pre-disciplinary detention. The middle floors comprise the Management Control Unit, inmates who are high risk security problems. Seven Up occupies the upper floors of the wing.
 
 
 81
 Appendix at 13a-15a.
 
 
 82
 Based on these findings of fact and a review of the Trenton State Prison Inmate Handbook 1977 and the Trenton State Prison Inmate Handbook Addendum February 18, 1977 (collectively the Handbook), which establish inmates' rights and responsibilities, the Magistrate recommended an $800 damage award against Hilton for violating the fourteenth amendment rights of Gibson. She recommended that judgment be entered in Hilton's favor on the eighth amendment claim and in Lynch's favor on both the fourteenth and eighth amendment claims relating to Gibson's confinement at Yardville. She further recommended judgment in favor of Fauver on both claims as he was not the Commissioner at the time the events occurred. In an April 17, 1980 Order, the district court adopted the recommendations of the Magistrate including those related to attorney's fees and costs. The defendant, Gary Hilton, filed a timely Notice of Appeal and Gibson did not cross-appeal.[1]
 
 II.
 State-Created Liberty Interests
 
 83
 It is axiomatic that before the due process clause of the fourteenth amendment is triggered, Gibson must establish the existence of a constitutionally significant liberty interest. It is also clear that, "(l)iberty interests may be created by state law as well as by federal law." Majority Opinion, Typescript at 9; Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). In Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the Supreme Court stated,
 
 
 84
 "that to obtain a protectible right a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."
 
 
 85
 442 U.S. at 7, 99 S.Ct. at 2103 (citation omitted), quoting Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 538 (1972); Micklus v. Carlson, 632 F.2d 227, 237-38 (3d Cir. 1980); Winsett v. McGinnes, 617 F.2d 996, 1005 (3d Cir. 1980) (in banc), cert. denied, Anderson v. Winsett, --- U.S. ----, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981).
 
 
 86
 The state-created right need not be embodied in a statute. As Judge Rosenn wrote for the full court in Winsett, "we do not believe that Winsett's concession that the statute itself does not create the state-created right is fatal to his case, for we believe the right may be established in the regulations implementing the statute." 617 F.2d at 1005. Moreover, the protectible liberty interests could be found "not only by statutorily created rights but also by official policies or practices." Id. at 1006 citing Durso v. Rowe, 579 F.2d 1365 (7th Cir. 1978), cert. denied, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). The plaintiff in Winsett, a Delaware prisoner, was denied admittance into the state's work release program because of the public notoriety of his crime even though he had successfully met all of the criteria for work release. Judge Rosenn set out and analyzed the Delaware regulatory scheme:
 
 
 87
 The work release statute and the regulations envision the grant of work release when a prisoner meets certain eligibility criteria and the prison authorities, exercising their sound discretion, concur that work release is appropriate. The presence of discretion on the part of the prison authorities in the work release program does not negate the possibility that a state-created entitlement to work release may exist, because we do not view the prison authorities' discretion as absolute. If the prison authorities could by the arbitrary exercise of discretion deny a work release application to a prisoner even though he met all eligibility requirements, then any entitlement to work release would be illusory rather than real. The trial court apparently perceived the discretion vested in the Delaware prison authorities as unbridled, rendering any claim of entitlement to work release an illusion. We are not persuaded, however, that the Superintendent's discretion under the state regulations in granting work release is as boundless as the trial court believed.
 
 
 88
 The authority of the Department of Corrections to adopt regulations governing work release stems from the work release statute, 11 Del.C. § 6533(a). Although the trial court may be correct that the regulations adopted do not exhaust the criteria pertinent to a decision whether or not to grant work release, it is by no means clear that the Superintendent may, under the rules, invoke any criterion he chooses. First, the state has established an elaborate institutional system for processing work release applications, a system that at various times has included at least two and sometimes three separate committees whose recommendations were forwarded to the Superintendent. We cannot believe that those committees, whose function apparently involved making rather detailed evaluations of inmates' fitness for work release, were intended to be overridden for any reason chosen by the Superintendent, however unrelated to the statutory purpose of section 6533.
 
 
 89
 More critically, 11 Del.C. § 6533(a), under which the regulations were promulgated, is itself subordinate to section 6531, which sets forth the programs including work which the Commissioner must establish, and the purposes those programs must serve. That section provides, in pertinent part:
 
 
 90
 Persons committed to the institutional care of the Department shall be dealt with humanely, with effort directed to their rehabilitation, to effect their return to the community as safely and promptly as practicable. The Commissioner shall establish the following programs, and may establish others: Education, including vocational training; work; case work counselling and psychotherapy; library and religious services; commissary; and shall institute procedures for the study of classification of inmates for these purposes.
 
 
 91
 The regulations promulgated under section 6533(a) must thus satisfy the broad dictates of section 6531: "humane" treatment, "rehabilitation," and "return to the community as safely and promptly as practicable." Thus, these are benchmarks which delineate the perimeters of the Superintendent's exercise of discretion, unlike Meachum v. Fano, supra, where the discretion to transfer under state law was absolute. Here, the "regulations imposed on the (Superintendent) indicate that discretion may be exercised only within established parameters." Tracy v. Salamack, 572 F.2d 393, 395 n.9 (2d Cir. 1978). (bracketed material in original).
 
 
 92
 617 F.2d at 1006-07 (emphasis added).
 
 
 93
 The parallel between the regulatory scheme in Winsett and the present case is too striking to be denied. Title 30 of the New Jersey Statutes Annotated, provides in mandatory terms for the establishment of institutional rules and regulations to govern the rights and obligations of inmates and for the distribution of these rules to every inmate.[2] 30 N.J.Stat.Ann. § 4-8.4, 8.5. For Trenton State these rules and regulations are stated in the Handbook and are identical to those codified in Title 10:35-2.4 of the New Jersey Administrative Code.[3] It is clear that, while Gibson was in solitary confinement for the three-month period, he was regularly deprived of numerous specifically enumerated entitlements. Neither the majority nor the defendants argue that the Magistrate's findings are clearly erroneous.
 
 
 94
 In light of Winsett, the unconstitutional deprivations which Gibson suffered without any due process protections suffice to show the error of the majority's holding. Gibson did not, however, merely lose a number of isolated rights. For three months he was held in solitary confinement under grossly inadequate conditions and forced to spend all but 10 minutes of each day locked inside a 5 foot by 7 foot by 8 foot steel cage. It is an uncontroverted fact that Gibson committed no infraction and that if he had he would have been entitled to a due process hearing after which the maximum period of solitary confinement would be 30 days. It is this totality of circumstances which led the Magistrate to conclude that "plaintiff's interest in the way of life which is afforded to inmates who are not subject to disciplinary restrictions 'has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances....' " Appendix at 27a, quoting Wolff, 418 U.S. at 557, 94 S.Ct. at 2975.
 
 
 95
 The majority asserts four basic arguments in opposition to the Magistrate's conclusion. First, they argue that the Commissioner is empowered with broad discretion in the administration of a penal institution. Second, they point to the lack of available space at Rahway for Gibson and the need to keep him out of Trenton's general population. Third, they contend that while a hearing is required for every form of solitary confinement mentioned in the Handbook and New Jersey Administrative Code the addition of a new category entitled "administrative quarantine" and the absence of a hearing requirement for it obviates any need for due process. Fourth, they assert that since the prison administration cannot imagine what a due process hearing would consist of under these circumstances no appropriate procedure could have been adopted. I am not convinced by any of the four rationales advanced by the majority.
 
 A.
 
 96
 It is true, as the majority observes, that New Jersey empowers the Commissioner with broad discretion. Majority Opinion, Typescript at 13. This discretion, however, is not unbridled. The Commissioner's discretion is restricted in numerous instances both by statute and by the requirement that any exercise of discretion not be arbitrary. Winsett v. McGinnes, 617 F.2d at 1006. As I noted in footnote 2 above, the Commissioner is under a statutory mandate to promulgate rules and regulations for the operation of the state's prisons. Surely the majority cannot contend that once such rules are established, the Commissioner is free to disregard them with impunity.
 
 
 97
 The Commissioner has performed his statutory duty and promulgated rules and regulations which have been codified in the New Jersey Administrative Code and distributed to inmates in the Handbook. Unquestionably a number of these rights were taken from Gibson without due process of law. The prison officials violated virtually all of the rights included in the Handbook. See, footnote 3, supra, and Appendix at 13a, 14a, 17a, 26a and 27a.[4] If, as in Winsett, the entitlement is to be more real than illusory, the Commissioner's grant of discretion cannot be read to encompass the power to suspend duly promulgated rules, including specifically enumerated rights, without some form of due process. 617 F.2d at 1006.
 
 
 98
 The majority's reference to N.J.S.A. 30:4-85, 30:4-91.1 and its reliance on Supreme Court cases involving prison transfers are misplaced. New Jersey has by statute expressly given the Commissioner the sole authority to transfer inmates. Thus, an inmate does not have a legitimate expectation that he or she will remain in a specific institution. In the present case, however, the majority does not point to any statutory provisions authorizing the suspension of inmate rights at the Commissioner's discretion. Simply stated, New Jersey meant to give its Commissioner broad discretion to construct a system of rules for its institutions but did not intend to provide the Commissioner with a broad brush of discretion capable of painting a mere canvas of illusion.
 
 B.
 
 99
 The majority makes much of the problems experienced by New Jersey with overcrowding in its prisons and the disturbance at Leesburg State Prison. I have nothing but respect for the difficult job faced by prison administrators who rarely are given adequate means with which to properly run an institution. Yet, I fail to see how these concerns, assuming for the moment they are bona fide, are relevant to a court of appeals considering the state's failure to provide due process. I do not say that if the need were real it would not justify a suspension of certain state-created entitlements. My only contention is that some appropriate form of due process is required before or immediately after those entitlements are suspended. Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935.
 
 
 100
 Furthermore, in this case the reasons asserted by the prison officials for their treatment of Gibson are not completely bona fide. I cannot see how overcrowding in the state system or the disturbance at Leesburg has any bearing on whether an inmate receives clean laundry, access to educational and legal books, regular exercise, hot meals, a sanitary cell, and regular showers with soap, hot water and a towel. Clearly, Gibson did not have a right to demand a cell in Rahway if none were available. Yet, one wonders why solitary confinement was necessary for 90 days at Trenton State and then became unnecessary in the same institution immediately after Gibson filed his complaint seeking injunctive relief. Furthermore, how is it that 69 of the Leesburg inmates transferred to Trenton State because of a disturbance at Leesburg could be given a hearing and reassignment within a month while Gibson was forced to languish for three months? I cannot accept the majority's conclusion that the treatment Gibson received was in any way dictated by institutional necessity.
 
 C.
 
 101
 The crux of the majority's disagreement with the Magistrate's Report and Recommendation centers on Gibson's right to be treated in the same manner as other members of the general prison population who do not require isolation. Prior to February 18, 1977, the date the Addendum was added to the Handbook, solitary confinement was restricted to two categories of individuals. The first category is for inmates requiring special detention as a means of discipline. The Handbook contains a four-page description of the detention program. Detention requires a due process hearing and is limited to a maximum period of 30 days. The second category is called administrative segregation and it applies to "inmates in need of protective custody or who have continued to violate the institution's rules or regulations or who pose a continued serious threat to the inmate's safety and security." It, like detention, requires a due process hearing and can last as long as the inmate demonstrates an "inability to get along in the general population." N.J.A.C. 10:35.69.1(d).
 
 
 102
 The Addendum created two additional categories of special housing, Management Control Unit (MCU) and Administrative Quarantine. In Hodges v. Klein, 412 F.Supp. 896, 897 (D.N.J.1976), the district court described MCU as a "maximum security area ... in which certain inmates, determined to be disruptive or assaultive, are confined under twenty-four hour lock-up conditions." (Footnote omitted.) A due process hearing is required prior to removal to MCU.
 
 
 103
 The last category, Administrative Quarantine, makes no mention of a hearing. It is this classification in which Gibson was placed. The Magistrate noted that detention, segregation and MCU are the subject of lengthy consideration in the Administrative Plan Manual, which contains "all policy statements of the Board of Control," whereas Administrative Quarantine is covered solely by the brief outline in the Addendum. Appendix at 25a. The Magistrate concluded that the Addendum "does nothing to indicate any change in the expressed policy that isolated confinement for any appreciable period is to be preceded by a hearing and subject to continuing review." Appendix at 26a (footnote omitted). In short, the Magistrate believed and I agree that the Addendum's discussion of Administrative Quarantine was intended as a supplement to the classification scheme. Its purpose was to expand the category of prisoners who could be isolated and not to deprive these inmates of the rights afforded to every other isolated prisoner.
 
 
 104
 A further argument in support of the Magistrate's conclusion can be gleaned from the reason Gibson qualified for Administrative Quarantine. This category of isolation was intended, in part, for inmates like Gibson who were classified to go to Rahway but had to be placed in Trenton State pending space availability at Rahway. It was the judgment of the prison officials that, "plaintiff could not be assigned to a general population area within (Trenton State) because he was not the type of prisoner who would properly be classified for the Trenton Prison general population." Brief of Defendant-Appellant at 6 (emphasis added).
 
 
 105
 Accepting the officials' judgment as accurate,[5] how then does Gibson differ from a prisoner in the Segregation category, who is entitled to due process before he or she can be isolated because of an "inability to get along in the general population"? N.J.A.C. 10:35.69.1(d). Is the right to due process so fragile that it can be lost by a sleight of hand that alters form but leaves substance untouched? I cannot believe that such a drastic change in constitutional protection can be effected by the mere expedient of a name change. At least as to Gibson, Administrative Quarantine was exactly the same in purpose and effect as isolation in Segregation would have been.
 
 
 106
 The Magistrate heard the testimony of prison officials that the privileges and rights of general population did not have to be earned. An inmate in New Jersey is entitled to general population with all of its rights and responsibilities unless it is demonstrated that there are bona fide reasons for isolation. The Magistrate did not err when she concluded "that the expressed policies of the Department of Correction created a justifiable expectation that plaintiff would not be confined in isolation for three months in the conditions found to have existed." Appendix at 27a.
 
 D.
 
 107
 The final argument advanced by the majority is that the nature of a due process hearing under these circumstances is too unclear to be recognized. Frankly, I find the majority's adoption of the quote from Hilton's Reply Brief very disturbing. Majority Opinion, Typescript at 24. The quote in relevant part is as follows:
 
 
 108
 What plaintiff is really complaining about is the fact that he was kept in quarantine, not that he was not given a hearing. He would be just as dissatisfied about being kept in quarantine if he did have a hearing. And even if there were a "hearing" what would it consist of beyond a statement to plaintiff that he was being kept in quarantine because there was no cell space in general population? That explanation, plaintiff admitted, was given to him by prison personnel.
 
 
 109
 Reply Brief of Defendant-Appellant at 10.
 
 
 110
 Is it an acceptable answer to Gibson's plea for his constitutional right to due process that the defendants decided no hearing was necessary because Gibson would have been "dissatisfied about being kept in quarantine if he did have a hearing?" Can we say that a plaintiff who loses an entitlement without due process loses no more than the underlying right? There is but one answer to both of these questions and that is an unequivocal no.
 
 
 111
 As to the need for a hearing, I think the answer is equally clear. The officials assert that Gibson was not the "type" of inmate suitable for general population. Was this because someone advised the Superintendent that Gibson was homosexual, or that he was physically or psychically too fragile for Trenton State or was he denied his rights for some other unarticulated reason? How does the lack of available cells in general population relate to the manifest deprivations he experienced while in isolation? The record does not reveal what "type" of inmate Gibson is or why he could not have been placed in general population at an earlier date. The majority blanketly accepts the prison's assertions on appeal without regard for the damage done to Gibson's right of due process.
 
 
 112
 Experience has shown that when administrators are required to document the reasons for their decisions the constitutional and statutory rights of persons affected by those decisions receive greater consideration and protection. It is this value which is lost when the right to due process is abrogated. In the present case a clear articulation to Gibson of why he had to be isolated and an opportunity for him to explain why he believed he could handle the general population, as he apparently could after his lawsuit was filed, would have served this need. As the Magistrate suggested, a compulsory periodic review of Gibson's situation might have been enough to rectify the conditions of neglect in which he was forced to live. Perhaps if attention had been focused on Gibson as it was on the 69 inmates from Leesburg, he too could have been reassigned to more appropriate quarters. Instead, Gibson languished for 90 days in solitary confinement under shockingly inhumane conditions until he filed a lawsuit in the district court. The majority opinion condones this result. I must, therefore, dissent from the majority's holding that Gibson was not deprived of a constitutionally cognizable state-created liberty interest.
 
 
 113
 Because I find that Gibson has such a constitutional liberty interest, he would be entitled to immediate injunctive relief if he were still living in the deplorable conditions which caused this suit. Fortunately, he was removed from solitary confinement almost immediately after his complaint was filed, and the injunction issue is now moot. However, even though he would have been entitled to injunctive relief, if it were required, it does not automatically follow that he would be entitled to damages for the conditions he sustained because of the constitutional violation. To obtain damages, he must be able to overcome the powerful good faith immunity defense asserted by Hilton.
 
 III
 A.
 Good Faith Immunity
 
 114
 The Superintendent of Trenton State Prison is an official who qualifies for the defense of good faith immunity. Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The burden of establishing good faith rests with the official seeking immunity. Skehan v. Board of Trustees, 538 F.2d 53, 61-62 (3d Cir. 1976) (in banc). In Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), the Supreme Court considered the standards for rejecting the good faith immunity defense in the context of a prisoner's § 1983 suit for damages. There the Court noted that the immunity defense is unavailable to officials if "the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm." 434 U.S. at 562, 98 S.Ct. at 860. It is also unavailable if the official acted with " 'malicious intention.' " Id. Thus, either a knowing deprivation of an established constitutional right or an intentionally unconstitutional act will strip the official of his or her immunity.
 
 
 115
 The Magistrate found that while Hilton did not intentionally injure Gibson he did know of the injury and took no steps to alleviate it. The Magistrate concluded that Hilton, while not possessed of malicious intent, was aware of Gibson's rights and was, therefore, not able to avail himself of the immunity defense. I agree that this is not a case of malicious intent but I disagree with the Magistrate on whether Hilton could reasonably have known he was violating an established constitutionally protected right.
 
 
 116
 The events which form the basis of this appeal took place between March and June of 1977. While the Wolff decision came down in 1974, the Supreme Court did not decide Greenholtz until 1979 and our court did not decide Winsett until 1980. Hilton unquestionably knew that Gibson's state rights were being violated in 1977 but it would be unreasonable to expect him to know the constitutional significance of his actions prior to Greenholtz and Winsett. Hilton did not have reason to know that he was violating Gibson's constitutional rights at the time of his decision to place Gibson in solitary confinement. Skehan v. Board of Trustees of Bloomsburg State College, 590 F.2d 470, 493 (3d Cir. 1978), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979). Because I believe that Gibson's constitutionally protected liberty interests were not clearly established in 1977, I would reverse the Magistrate's refusal to extend good faith immunity to Hilton.
 
 B.
 Attorney's Fees and Costs
 
 117
 Gibson's court-appointed counsel was awarded attorney's fees and costs as the prevailing party under 42 U.S.C. § 1988. The issue of what constitutes "prevailing" for the purposes of a § 1988 award of attorney's fees is difficult. In Hughes v. Repko, 578 F.2d 483, 486 (3d Cir. 1978), Chief Judge Seitz wrote,
 
 
 118
 The Civil Rights Attorney's Fees Awards Act of 1976 provides that "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee." As in cases assessing other court costs, it is not always easy to determine who is the "prevailing party," particularly where there are multiple claims and/or multiple parties, and where the petitioning party is not completely successful.
 
 
 119
 In this case, Gibson sued multiple parties and lost entirely on claims against the Superintendent of Yardville and the Commissioner of the Department of Corrections. Under my view of the case, he prevailed on the establishment of a constitutional right to due process but lost on the issue of damages against Superintendent Hilton. Does the existence of a good faith immunity defense operate to bar Gibson from the status of prevailing party and his attorney thereby from attorney's fees under § 1988?
 
 
 120
 This would be a close question for construction of § 1988, and immunity might preclude Gibson from collecting counsel fees under the facts of this case. But in view of the majority position that there was no constitutional violation, the prevailing party question can be left for consideration on another day when it will be decided on its merits rather than discussed as dicta.[6]
 
 
 
 [1]
 While we have serious questions about the district court's ruling that Hilton was not entitled to immunity under the circumstances present in this case, we have no need to address that issue because of our disposition of Gibson's due process claim
 
 
 [2]
 The magistrate found that this transfer further exacerbated the housing and security situation at Trenton. (15a)
 
 
 [3]
 Gibson was moved once during this period between two similar cells. The first cell was in the "Seven Left" Wing, where he remained for four days. The second was in "Seven Up," where he remained until June 1, 1977
 
 
 [4]
 Gibson was permitted access to the law library through the offices of a paralegal group
 
 
 [5]
 On April 17, 1980, the district court after having reviewed the entire record entered its order adopting the report, findings, conclusions, and recommendations of the magistrate as they are reflected in the magistrate's original report of May 25, 1979 and the amended report of June 21, 1979. Because the district court has adopted the magistrate's report in full, when we refer to findings and conclusions throughout this opinion we will attribute them to the district court
 
 
 [6]
 At Yardville, reception and classification of prisoners which includes physical, vocational and aptitude evaluation normally takes from three to four weeks
 
 
 [7]
 With respect to Gibson's stay at Yardville, the district court held that Gibson had failed to establish any violation of his fourteenth amendment rights as they pertain to confinement at that institution. This issue is not the subject of a cross-appeal by Gibson. If it had been, we would have no hesitation, on this record, in affirming the district court's conclusions
 
 
 [8]
 Rocca v. Groomes, 144 N.J.Super. 213, 365 A.2d 195 (App.Div.1976), a New Jersey Appellate Division decision, which concerns the transfer of a prisoner to a maximum security institution, confirms the Commissioner's broad discretionary powers. That decision also disposes of any contention that pre-transfer hearings are required in New Jersey
 We observe that the Commissioner is even empowered to transfer inmates to an institution in a state other than New Jersey when it is determined that such confinement is desirable. N.J.S.A. 30:7C-5.
 
 
 [9]
 These rules which are an official document of the Division of Correction and Parole and which among other provisions, advise as to rights and privileges, appear in the Trenton State Prison Inmate Handbook and its Addendum. The Handbook is published pursuant to regulations promulgated by the Commissioner which authorize the publication and its issuance to inmates, N.J.A.C. 10-35:49.1 et seq
 
 
 [10]
 The Inter-Institutional Classification Committee is comprised of the Superintendents of Trenton, Rahway and Leesburg State Prisons or their designates. The committee meets once a week. Trenton State Prison Inmate Handbook (1977)
 
 
 [11]
 We observe as well, although the regulation was not cited to us by any party, that N.J.A.C. 10:34-1.7 provides that single occupant cells and detention rooms shall be used for, among other purposes, the housing of newly committed inmates
 
 
 [12]
 The dissent contends that the prison authorities, in assigning housing to Gibson were not motivated by bona fide reasons and constructs an argument based upon the timing of Gibson's transfer to the lower floors of Seven Wing, relating it to the filing of Gibson's complaint (dissenting op. typescript at 11). The coincidence that these cells became available for occupancy at about the same time that Gibson filed his complaint cannot detract from the findings made by the magistrate and adopted by the district court to the effect that the actions taken by the authorities were indeed bona fide. (Appendix at 15a-16a, 22a, 23a, 30a) Gibson himself does not argue otherwise
 
 
 [13]
 The Addendum provides that administrative quarantine at the Trenton State Prison "... is to be used for the specific housing of ... housing holds assigned by (the) ... Classification Committee ... to Rahway...."
 Placement in Administrative Quarantine was under the direct control of the Superintendent at Trenton, and those in Administrative Quarantine were afforded:
 
 
 [1]
 Daily medical/dental and professional treatment staff services
 
 
 [2]
 Regularly scheduled showers
 
 
 [3]
 Current rules and policies governing the general population regarding reading-writing materials. Smoking in their cells personal clothing and weekly canteen service
 
 
 [4]
 Inmates are entitled to window phone visits per institutional policy
 
 
 [5]
 Inmates are entitled to phone calls per institutional policy
 
 
 [6]
 Inmates do not have contact visit rights while in Administrative Quarantine
 
 
 [7]
 Inmates do not have yard recreation rights while in Administrative Quarantine
 
 
 [8]
 Inmates assigned to Administrative Quarantine are not processed through the State Prison, Trenton Prison Classification Committee for custody or program assignments
 
 
 [1]
 Since Gibson did not appeal the district court's order as it pertains to Hilton on the eighth amendment claim or the order as it relates to Lynch and Fauver, I express no opinion on the majority's decision in these matters
 
 
 [2]
 Title 30:4-8.4 provides,
 Subject to guidelines set down by the Director of the Division of Correction and Parole, every State penal and correctional institution shall formally promulgate and publish rules and regulations governing the rights, privileges, duties and obligations of the inmate population confined therein. Among other things, such publications shall set forth the authorized sanctions for various classes of violations of the aforesaid rules and regulations, and detail the procedures for imposing summary and administrative punishment as well as for appealing therefrom. No punishment may be meted out other than of the type and in the manner prescribed by such rules and regulations.
 Title 30:4-8.5 provides, in relevant part,
 Upon the arrival of a prisoner in any correctional institution in the State, he shall be furnished with a copy of the institution's rules and regulations and shall have the meaning of the same explained to him.
 
 
 [3]
 The basic rights enumerated in 10:35-2.4 are as follows:
 
 
 [1]
 You have the right to expect that as a human being you will be treated respectfully, impartially and fairly by all personnel
 
 
 [2]
 You have the right to be informed of the rules, procedures, and schedules concerning the operation of the institution
 
 
 [3]
 You have the right to freedom of religious affiliation, and voluntary religious worship
 
 
 [4]
 You have the right to health care which includes nutritious meals, proper bedding and clothing, a laundry schedule for cleanliness of the same, an opportunity to shower regularly, proper ventilation for warmth and fresh air, a regular exercise period, toilet articles and medical and dental treatment
 
 
 [5]
 You have the right to correspond and visit with family members, friends and other persons where there is no threat to security, order or rehabilitation in keeping with the rules and schedules of the facility
 
 
 [6]
 You have the right to unrestricted and confidential access to the courts by correspondence (on matters such as the legality of your conviction, civil matters, pending criminal cases and to conditions of your confinement)
 
 
 [7]
 You have the right to legal counsel from an attorney of your choice by interviews and correspondence
 
 
 [8]
 You have the right to participate in the use of law library reference materials to assist you in resolving legal problems. You also have the right to receive help when it is available through a legal assistance program
 
 
 [9]
 You have the right to a wide range of reading material for educational purposes and for your own enjoyment
 
 
 [10]
 You have the right to participate in counseling, education, vocational training and employment as far as resources are available, and in keeping with your interests, needs and abilities
 
 
 [4]
 The Magistrate found that Gibson did not receive a copy of the Handbook until May 5 although he arrived at Trenton State on March 4 and that he never received the Addendum. Appendix at 17a. This expressly violates Gibson's right to be advised of the institution's rules and regulations. Furthermore, the Magistrate found that:
 All of the following privileges were denied to plaintiff for all or a substantial part of his confinement in Administrative Quarantine: an adequate clothing supply (N.J.A.C. 10:35-3711) to be issued shortly after admission (N.J.A.C. 10:35-43.5); active and passive recreation including athletics, movies, reading and games (N.J.A.C. 10:35-45.5); television in the auditorium twice weekly (N.J.A.C. 10:45-6); daily active indoor or outdoor recreation even though confined to reception or administrative segregation or a special treatment unit (N.J.A.C. 10:45-13); a weekly movie (N.J.A.C. 10:45-19); two hours per week of exercise even though confined to administrative segregation (N.J.A.C. 10:69 69-13). The importance of recreation in a prison environment can best be appreciated in the light of a pointed provision in the Administrative Code. "All inmates are eligible to participate in the recreation program. The only restrictions are for medical or disciplinary reasons." N.J.A.C. 10:35-45.2. One hour's daily active recreation is to be afforded to inmates. N.J.A.C. 10:35-45.3. Those inmates who are confined to Administrative Segregation and whose privileges are restricted for disciplinary or security reasons are seemingly guaranteed some exercise. See N.J.A.C. 10:35-70-6. "Evidence must be presented at the hearing, for example, which indicates security reasons for not allowing such inmates to be freed for exercise purposes." It is of some interest to note that these listed privileges, when taken together, appear to establish a practice of affording inmates an opportunity to associate with other inmates. It is highly unlikely that active recreation and attendance at movies and television are intended to be afforded to prisoners in isolation from each other.
 It is concluded that the expressed policies of the Department of Correction created a justifiable expectation that plaintiff would not be confined in isolation for three months in the conditions found to have existed. It is concluded that plaintiff's interest in the way of life which is afforded to inmates who are not subject to disciplinary restrictions "has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935. It is concluded that plaintiff was not afforded any required procedures at Trenton State Prison.
 Appendix at 26a and 27a.
 
 
 [5]
 As noted earlier, it is difficult to see how the prison officials can argue that Gibson required isolation prior to his filing of a complaint in district court but somehow did not afterwards
 
 
 [6]
 As our court wrote in Ross v. Horn, 598 F.2d 1312, 1322 (3d Cir. 1979), cert. denied, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980), "(i)n assessing who is a prevailing party, we look to the substance of the litigation's outcome." There, we upheld a district court judgment against a plaintiff who had challenged on due process grounds certain procedures of the New Jersey Department of Labor and Industry. Nevertheless, we remanded the issue of attorney's fees because, subsequent to the plaintiff's filing of her lawsuit but before judgment, New Jersey changed its procedures. On remand the district court was asked to consider whether the plaintiff's filing of suit caused the change. Attorney's fees would be appropriate on all claims in which the plaintiff "essentially succeeded" regardless of the form of the judgment. Id. quoting, Hughes v. Repko, 578 F.2d 483, 487 (3d Cir. 1978). Ross, of course, did not involve any issue of immunity. Here the Magistrate found "that the judgment in this case may well correct an across the board violation of rights of a substantial class." Perhaps if New Jersey henceforth was required to provide due process to all inmates in Administrative Quarantine and this new procedure was the result of Gibson's suit, he would have "essentially succeeded" despite the unavailability of damages against Hilton. See, Morrison v. Ayoob, 627 F.2d 669 (3d Cir. 1980); Skehan v. Board of Trustees of Bloomsburg State College, 590 F.2d 470 (3d Cir. 1978)